# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| *In re: BP p.l.c. Securities Litigation* | No. 4:10-MD-2185 |
| **This document relates to:** | |
| *Alameda County Emp. Retirement Assoc. v. BP p.l.c.* | No. 4:12-cv-01256 (cons.) |
| *Avalon Holdings Inc. v. BP p.l.c.* | No. 4:12-cv-03715 |
| *South Yorkshire Pensions Authority v. BP p.l.c.* | No. 4:12-cv-02362 (cons.) |
| *Mondrian Global Equity Fund, L.P. v. BP p.l.c.* | No. 4:12-cv-03621 |
| *Stichting Pensioenfonds Metaal en Techniek v. BP p.l.c.* | No. 4:13-cv-00069 |
| *HESTA Super Fund v. BP p.l.c.* | No. 4:13-cv-00129 |
| *New York City Employees' Retirement System v. BP p.l.c.* | No. 4:13-cv-01393 |
| *Nova Scotia Health Employees' Pension Plan v. BP p.l.c.* | No. 4:13-cv-03397 |
| *Ark. Teacher Retirement System v. BP p.l.c.* | No. 4:14-cv-00457 |
| *The Bank of America Pension Plan v. BP p.l.c.* | No. 4:14-cv-01418 |
| *Deka Investment GmbH v. BP p.l.c.* | No. 4:14-cv-01073 |
| *DiNapoli v. BP p.l.c.* | No. 4:14-cv-01083 |
| *IBM United Kingdom Pension Trust Limited v. BP p.l.c.* | No. 4:14-cv-01279 |
| *Merseyside Pension Fund v. BP p.l.c.* | No. 4:14-cv-01281 |
| *Pension Reserves Inv. Mgmt. Bd. of Mass. v. BP p.l.c.* | No. 4:14-cv-01084 |
| *Universities Superannuation Scheme Ltd. v. BP p.l.c.* | No. 4:14-cv-01280 |
| *Virginia Retirement System v. BP p.l.c.* | No. 4:14-cv-01085 |
| *Washington State Investment Board v. BP p.l.c* | No. 4:14-cv-00980 |
| | Honorable Keith P. Ellison |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaints. (Dkt. 1418, 1419, 1569, 1570.) All named defendants ("Defendants") join this motion. The motion seeks to narrow the claims asserted in eighteen of the so-called individual investor actions. Defendant Rainey also filed a separate motion to dismiss the twelve amended complaints that bring claims against him. (Dkt. 1420, 1421.)

The plaintiffs in the relevant individual investor actions (the "Plaintiffs") filed briefs in opposition to the motions to dismiss:[1]

- The plaintiffs in eleven of the individual investor actions, each of whom is represented by Pomerantz LLP (the "Pomerantz Plaintiffs"),[2] have jointly filed an opposition brief (Dkt. 1539, 1571) and appended a 75-page declaration from their English law expert, Thomas Lowe;
- The plaintiffs in *DiNapoli* v. *BP p.l.c.* (14-cv-1083) and *Pension Reserves Invest. Mngt. Board of Mass.* v. *BP p.l.c.* (14-cv-1084) (the "NY/MassPRIM Plaintiffs") have jointly filed a brief in opposition (Dkt. 1527);
- The plaintiffs in *Avalon Holdings, Inc., et al.* v. *BP p.l.c. et al.* (12-cv-3715) filed a brief in opposition (Dkt. 1528);
- The plaintiffs in *Arkansas Teacher Retirement System* v. *BP p.l.c. et al.* (14-cv-0457) and *Virginia Retirement System* v. *BP p.l.c. et al.* (14-cv-1085) (the "AK/VA Plaintiffs") have jointly filed an opposition brief (Dkt. 1534); and
- The plaintiffs in *Washington State Investment Board v. BP p.l.c.* (14-cv-980) have filed an opposition brief.[3]

Defendants have filed replies in support of their motion to dismiss (Dkt. 1546, 1577), as has Defendant Rainey (Dkt. 1547). The parties additionally presented oral arguments at a hearing on

---

[1] The plaintiffs in *Deka Investment GMBH et al.* v. *BP p.l.c. et al.* (14-cv-1073) (the "Deka Plaintiffs") filed an opposition brief (Dkt. 1526), but, pursuant to the Stipulation and Order Regarding Motion to Dismiss, Defendants subsequently withdrew their motion to dismiss the Deka complaint. (Dkt. 1550.)

[2] These actions include:

- *Alameda County Emps.' Ret. Assoc., et al.* v. *BP p.l.c., et al.* (12-cv-1256);
- *South Yorkshire Pensions Auth. et al.* v. *BP p.l.c. et al.* (12-cv-2362);
- *Mondrian Global Equity Fund, L.P. et al.* v. *BP p.l.c. et al* (12-cv-3621);
- *Stichting Pensioenfonds Metaal en Techniek et al.* v. *BP p.l.c. et al.* (13-cv-0069);
- *HESTA Super Fund et al.* v. *BP p.l.c. et al.* (13-cv-0129)
- *N.Y.C. Emps. ' Ret. Sys et al.* v. *BP p.l.c. et al.* (13-cv-1393);
- *Nova Scotia Health Emps.' Pension Plan et al.* v. *BP p.l.c. et al.* (13-cv-1393);
- *The Bank of America Pension Plan et al.* v. *BP p.l.c. et al.* (14-cv-1418);
- *IBM United Kingdom Pensions Trust Ltd., et al.* v. *BP p.l.c. et al.* (14-cv-1279);
- *Merseyside Pension Fund* v. *BP p.l.c. et al.* (14-cv-1281);
- *Universities Superannuation Scheme Ltd.* v. *BP p.l.c. et al.* (14-cv-1280).

[3] The Washington State Plaintiffs did not file their motion on the MDL docket. They filed their opposition only on their individual docket (14-cv-980).

May 8, 2017. (Dkt. 1557 ("Hr'g Trans.").)  At the hearing, the Court stated that it would dismiss the complaints against Defendant Rainey, but would take Defendants' Motion to Dismiss under advisement.  (Hr'g Trans. 98:10-11.)

Also before the Court is Plaintiffs' Motion to Strike the Declaration of Martin Moore. (Dkt. 1552, 1579.)  Defendants have filed a brief in opposition to the motion (Dkt. 1561), and Plaintiffs have filed a reply.  (Dkt. 1564.)

## I.  BACKGROUND

### A.  Factual Background

The Deepwater Horizon, an off-shore drilling rig leased by BP, exploded around 10:00 p.m. on Tuesday, April 20th, 2010, resulting in the deaths of eleven workers and a catastrophic oil spill.  The Court has written at length regarding this tragedy, the conduct that presaged it, and BP's response to the crisis.  An extensive description of the factual allegations may be found in two of the Court's prior orders.[4]

### B.  Procedural History

Since April 20, 2010, BP shareholders have filed more than three dozen lawsuits alleging that BP engaged in misconduct related to the Deepwater Horizon explosion.  These suits included a shareholder derivative law suit, which the Court dismissed in 2011 on the grounds of *forum non conveniens*; an ERISA class action, which the Court dismissed in March of this year; and a class action alleging securities fraud under federal law, which settled in February of this year.

---

[4] *See In re BP p.l.c. Securities Litig. ("BP I"),* 843 F. Supp. 2d 712, 724–25, 741–42 (S.D. Tex. 2012); *In re BP p.l.c. Securities Litig. ("BP II"),* 852 F. Supp. 2d 767, 775–78 (S.D. Tex. 2012).

With one exception,[5] the lawsuits remaining in this multi-district litigation are securities fraud claims brought by individual investors.[6]  In the interest of judicial efficiency, the parties and the Court have grouped these cases into different "tranches" based on when the suits were filed and, when possible, collectively addressed each tranche with consolidated motions and briefing.  The Tranche 1 Plaintiffs filed suit in 2012 asserting claims for relief under federal securities statutes, state securities statutes, and the common law of several states.  Defendants moved to dismiss, arguing that English law governs Plaintiffs' claims, and that Plaintiffs had failed to state a claim under English law.  The Court granted Defendants' motion with respect to their choice-of-law argument—English law governs—but it also held that, even under English law, the Tranche 1 Plaintiffs had adequately alleged claims for relief.[7]

Additional plaintiffs had filed suit during the pendency of Defendants' first motion to dismiss, so Defendants filed a motion to dismiss those newly-filed actions (the "Second Motion to Dismiss"). Because the issues raised in the Second Motion to Dismiss were similar to those raised in the First, Defendants and the Tranche 2 Plaintiffs sought to avoid duplicative briefing by agreeing upon how the Tranche 1 Order might apply to the Tranche 2 Plaintiffs' complaints. After extensive negotiations, the parties memorialized their agreement in the form of a joint

---

[5] Another putative class action was recently filed in *Mondrian Global Equity Fund, L.P. et al v. BP PLC et al*, 4:16-cv-1307.

[6] The individual investor actions deviate from the now-settled Class Action in several respects. Most important, because U.S. federal securities laws do not provide relief for losses experienced on foreign exchanges, *BP I,* 843 F. Supp. 2d at 796, the class was limited to those who purchased BP American Depository Shares ("BP ADS") on U.S. stock exchanges.  Here, all Plaintiffs purchased BP's "Ordinary Shares" on the London Stock Exchange, and they therefore must seek recovery under English securities laws.  (Some Plaintiffs purchased both BP ADS and Ordinary Shares.  Those Plaintiffs assert claims here under both the Exchange Act and English law.)

[7] *See In re BP P.L.C. Sec. Litig.* ("*Alameda*"), 2013 WL 6383968, at *16 (S.D. Tex. Dec. 5, 2013).

stipulation and filed it with the Court. (Dkt. 719, the "First Conforming Stipulation".) The First Conforming Stipulation acknowledged that "the Court will most likely deem the [Tranche 1 Order] to be applicable to the [Tranche 2 Plaintiffs' complaints]," and therefore stipulated that (i) English law applies to all of the Tranche 2 Plaintiffs' claims (except for their federal Exchange Act claims), and (ii) subject to Court approval—which the Court granted on December 10, 2013—certain enumerated claims would be dismissed. In effect, the First Conforming Stipulation served as a de facto amendment that narrowed the breadth of the Tranche 2 Plaintiffs' complaints, thereby narrowing the issues that the parties would need to address in the Second Motion to Dismiss.

Following entry of the First Conforming Stipulation, Defendants filed a revised Second Motion to Dismiss. The Court granted the motion in part, but held that some of the Tranche 2 Plaintiffs' claims could proceed. The parties also agreed that the Tranche 3 Plaintiffs, whose complaints had not yet been subject to motions to dismiss, could amend their claims as of right. The plaintiffs in Tranches 1, 2, and 3 then jointly engaged an English law expert to better understand how the application of English law would affect their cases.

On August 31, 2014, each of the Tranche 3 Plaintiffs filed amended complaints asserting securities fraud claims under English law. Shortly thereafter, the Tranche 1 and 2 Plaintiffs filed motions for leave to amend their complaints, attaching proposed amended complaints to the motions. According to the Tranche 1, 2, and 3 Plaintiffs, the revised complaints displayed significant uniformity in their claims and allegations, contained better-developed facts, and displayed better-constructed claims thanks to the counsel of their English law expert. Defendants indicated that they would consider allowing the motion to proceed unopposed, but first needed to review the proposed amendments.

One subset of the Tranche 1 and 2 Plaintiffs (the "Non-Pomerantz Plaintiffs") reached an accord with Defendants: Defendants would allow the Non-Pomerantz Plaintiffs' motions to proceed unopposed if the Non-Pomerantz Plaintiffs would stipulate to the effect of the Tranche 2 Order.[8]  Those parties entered into an additional "conforming" stipulation (the "Second Conforming Stipulation"), and the Court granted the Non-Pomerantz Plaintiffs' motions for leave to amend.  The Non-Pomerantz Plaintiffs filed their amended complaints shortly thereafter.

The Pomerantz Plaintiffs and Defendants were able to whittle down the list of disputed amendments, but were unable to reach total accord.  Defendants argued that the Tranche 1 Order and the First Conforming Stipulation dismissed the Tranche 1 and 2 Plaintiffs' "holder claims," and that the Pomerantz Plaintiffs should not be allowed to reassert those claims.  In response, the Pomerantz Plaintiffs noted that the Tranche 1 Order—and, by extension, the First Conforming Stipulation—merely dismissed the holder claims as then pled under state law, but did not prohibit the Plaintiffs from re-pleading English law holder claims based on newly-discovered facts.  After it became clear that the parties had reached an impasse on this one remaining issue, Defendants filed their opposition to the Pomerantz Plaintiffs' motion for leave.

The Court granted the Pomerantz Plaintiffs' motion for leave, and those plaintiffs filed their amended complaints shortly thereafter.  Broadly, the Pomerantz Plaintiffs amended their complaints in two notable ways: (i) they re-pled their "holder claims" under English law and bolstered the claims with newly discovered facts, and (ii) they alleged a number of additional public and private misstatements.

---

[8] The Tranche 1 and 2 Plaintiffs who entered into the Second Conforming Stipulation are represented by counsel other than Pomerantz LLP.

Defendants now move to dismiss the Pomerantz Plaintiffs' holder claims as well as all claims based on the newly alleged misstatements. Defendants' motion also targets several claims made by the Non-Pomerantz Plaintiffs.

## II.  <u>LEGAL STANDARD</u>

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of Plaintiffs.[9] The Court does not accept as true, however, "conclusory allegations, unwarranted factual inferences, or legal conclusions."[10]

Plaintiffs primarily bring their claims under English law—some bring claims under U.S. federal law—but "[r]egardless of the substantive law that governs [their] claims, the Court will apply federal procedural law in this case."[11] Accordingly, the Court must decide if Plaintiffs have stated a claim pursuant to the pleading standards contained in the Federal Rules. As with all claims subject to the federal rules, the pleading standards of Rule 8(a) apply. But, because Plaintiffs bring claims "alleging fraud or mistake," Rule 9(b) imposes a heightened pleading standard requiring that Plaintiffs "state *with particularity* the circumstances constituting [the] fraud."[12] To the extent that Plaintiffs are bringing claims under federal law, those claims are further subject to the heightened pleading standard imposed by the PSLRA. The PSLRA does not apply, however, to claims brought under English law.

_____

[9] *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 406 (5th Cir. 2001).

[10] *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).

[11] *Alameda*, 2013 WL 6383968 at *16 (citing *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008) ("[F]ederal courts use federal procedure even when applying state law")).

[12] Fed. R. Civ. P. 9(b) (emphasis added); *see also Alameda*, 2013 WL 6383968 at *16.

## A.    Rule 8(a) Notice Pleading

The default standard for pleading in federal court is contained in Rule 8(a): "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."[13] This standard is commonly referred to as "notice pleading."  Under notice pleading requirements, a complaint will survive a motion to dismiss as long as it contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face.[14]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[15]  As noted above, the Court is required to accept only well-pleaded *factual* allegations as true; it does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions."[16]

## B.    Heightened Pleading under Rule 9(b)

Plaintiffs' allegations of fraud must also meet the stricter standards of Rule 9(b): "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[17]  "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."[18]  In other words, "Rule 9(b) requires 'the

---

[13] Fed. R. Civ. Pro. 8(a)(2).

[14] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

[15] *Id.*

[16] *Cent. Laborers',* 497 F.3d at 550 (citation omitted) (internal quotation marks omitted).

[17]  Fed. R. Civ. P. 9(b).

[18] *Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted).

who, what, when, where, and how' [of the alleged fraud] to be laid out."[19] Insufficiently particular fraud allegations are properly challenged by a Rule 12(b)(6) motion for dismissal for failure to state a claim.[20]

Rule 9(b)'s particularity requirement is "supplemental" to the *Iqbal* requirement that a pleading include facts that, taken as true, "state a claim to relief that is plausible on its face."[21] Thus, Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true."[22]

### C.    Additional Pleading Requirements Imposed by PSLRA

Plaintiffs' Exchange Act claims are further subject to the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). For each act or omission alleged to be false or misleading, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[23] This provision alters how the Court views allegations relevant to scienter at the pleading stage. While the Court in a 12(b)(6) motion is typically required to draw all reasonable inferences from the alleged facts in the Plaintiffs' favor, the PSLRA obligates the Court to consider *all* possible inferences from the facts—both those supporting and those undercutting scienter—in order to evaluate whether a "strong" inference of scienter exists.

---

[19] *Id.* (quoting *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 179 (5th Cir. 1997)).

[20] *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 185 n. 8 (5th Cir. 2009); *Carter v. Nationwide Prop. and Cas. Ins. Co.,* 2011 WL 2193385, at *1 (S.D. Tex. June 6, 2011).

[21] *Grubbs,* 565 F.3d at 185.

[22] *Id.* at 186 (internal quotation marks omitted).

[23]  15 U.S.C. § 78u–4(b)(2)(A).

### III.    THE HOLDER CLAIMS[24]

The parties have primarily focused their attention on Plaintiffs' bolstered holder claims, which Plaintiffs' bring under English common law.[25]  In a holder claim, the plaintiff alleges not that the defendant wrongfully induced the plaintiff to *purchase* stock during the "relevant period," but that the defendant's misrepresentation induced the plaintiff to continue holding (*i.e.*, refrain from selling) stock that he had already purchased.  When the price of the stock subsequently declines, the plaintiff is exposed to losses that he would have avoided had he sold the stock.

Defendants assert two arguments for dismissing Plaintiffs' holder claims.  First, they argue that all of the holder claims should be dismissed because Plaintiffs' allegations of reliance do not meet the particularity requirement of Rule 9(b). (*See* Mot. 14-20.) Second, they aver that Plaintiffs' post-explosion holder claims should be dismissed because Plaintiffs fail to allege cognizable damages.  (Mot. 20-22.)

#### A.    Sufficiency of Reliance Allegations

Unlike federal securities law, English law does not presume reliance based on the theory of "fraud on the market."[26]  Instead, Plaintiffs must adequately allege "actual reliance" for each of their English law claims.[27]  Because "Rule 9(b) extends to allegations of reliance," Plaintiffs must "describe the circumstances of their reliance with particularity."[28]  In reviewing plaintiffs'

---

[24] To the extent that the Court refers to "Plaintiffs" in this Section III, the Court refers only to the Plaintiffs who have alleged holder claims.

[25] The Supreme Court has barred plaintiffs from bringing holder claims under federal securities laws.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).

[26] *Alameda*, 2013 WL 6383968 at *38.

[27] *Id.*

[28] *Id.* at *39.

allegations, however, courts remain cognizant of two important limiting principles: "First, what constitutes 'particularity' will necessarily differ with the facts of each case. Second, reliance allegations are often inherently conclusory: one either relies, or one does not rely."[29]

Although precedent is inescapably clear that Rule 9(b) requires plaintiffs to plead reliance with particularity,[30] the standard for doing so is nebulous. The typical articulation of the Rule— that it requires plaintiffs to allege specifically the "time, place, and contents of the alleged false representations, as well as the identity of the person making the misrepresentations and what that person obtained thereby"[31]—focuses on the specifics of the speaker and his statements, not the listener's reliance upon them. And because federal securities laws eschew the requirement of actual reliance entirely, there is a relative dearth of federal case law explaining what a plaintiff must plead to satisfy the strictures of Rule 9(b) in the context of securities fraud. Even fewer cases address this issue in the unique context of holder claims, and none do so with English common law as the backdrop. Unsurprisingly, the parties advance significantly different understandings of Rule 9(b)'s requirements.

### (1) Legal Standard for Pleading Reliance in the Context of Rule 9(b)

Plaintiffs argue that this Court has already explained what parties must allege to sufficiently plead reliance: "Rule 9(b) requires Plaintiffs to specify 'with particularity' what

---

[29] *Id.* (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992); *In re Compaq Securities Litig.*, 848 F. Supp. 1307, 1312 (S.D. Tex. 1993); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 275 (N.D. Tex. 1990)).

[30] *Id.* at *38-39 (discussing relevant case law). Whether Rule 9(b) applied to the reliance element of Plaintiffs' claims was hotly contested in Defendants' first consolidated motion to dismiss. The Court concluded its lengthy consideration of the issue by holding that it must comport with precedent and "apply the prevailing view that the particularity requirement of Rule 9(b) extends to allegations of reliance." The Court noted, however, that it "would not [have] independently arrive[d] at this conclusion." *Id.* at *39.

[31] *Id.* at *39 (citing *Williams*, 112 F.3d 175 at 179).

actions it took *or forewent* in reliance upon Defendants' alleged misrepresentations."[32]   The

Court went on to hold that, with respect to Plaintiffs' purchases of BP's stock, Plaintiffs had

adequately pled reliance by "identif[ying] . . . Plaintiffs' various purchases of BP's Ordinary

Shares within the relevant time period."[33]   Plaintiffs note that the Court did *not* require them to

allege the specific dates of their purchases, the precise number of shares they purchased, the

specific price at which the shares were purchased, or the specific misstatements that motivated

each purchase.   (Opp. at 27 (citing *Alameda*, 2013 WL 6383968, at *41).)   According to

Plaintiffs, this standard should apply with equal force to their holder claims.

Plaintiffs additionally argue that, in any event, the particularity requirements of Rule 9(b)

are effectively irrelevant because English law entitles them to a rebuttable presumption of

reliance.   (Opp. at 7, 28.)   As a result, say Plaintiffs, they need only "allege their 'holder claim'

theory in an 'intelligible and valid' manner under English law."   (Opp. at 28 (citing Lowe Decl.

¶¶49-130).)

Plaintiffs' understanding of this Court's *Alameda* holding is misguided.   The Court held

only that "Rule 9(b) requires Plaintiffs to specify 'with particularity' what actions it . . . forewent

. . . ."   In other words, the Court said nothing about *how* "specif[ic]" the allegations of

forbearance must be to satisfy Rule 9(b), merely that the actions the plaintiff forewent must be

specified "with particularity."   And nowhere in the opinion did the Court hold that the standard

for pleading reliance in a holder claim is equivalent to the standard for pleading reliance in a

purchaser claim.   To the contrary, the Court began its discussion of the issue by noting, "What

---

[32] *Alameda*, 2013 WL 6383968, at *41.

[33] *Id.* at *41.  The Court held that Plaintiffs had not adequately alleged reliance with respect
to their holder claims.

constitutes 'particularity' will necessarily differ with the facts of each case."[34]  Several courts have specifically recognized as much in the context of holder claims.[35]

Plaintiffs' dependence on the presumption of reliance under English law is similarly unavailing.  "[P]leading requirements are purely matters of federal law,"[36] and Plaintiffs fail to identify any legal authority suggesting that such a presumption obviates the particularity requirement of Rule 9(b).[37]  Instead, Plaintiffs repeatedly emphasize that their pleadings are sufficient under *English* law,[38] which misses the point entirely.  The relevant issue is whether Plaintiffs have adequately alleged reliance under *federal* pleading standards.  And the federal rules require that Plaintiffs do more than merely allege their holder claim theory "in an intelligible and valid manner"—they require that Plaintiffs do so with particularity.

Defendants, on the other hand, advance a different understanding of Rule 9(b)'s requirements.  Quoting language from *Pafumi v. Davidson*—a case in which a district court applied federal pleading standards to holder claims—Defendants argue that Rule 9(b) imposes a narrow set of requirements: "Plaintiffs must plead . . . 'how many shares [they] would have

---

[34] *Id.* at *39 (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (holding that "Rule 9(b)'s ultimate meaning is context-specific" and noting that, in certain circumstances, "9(b) takes on especial force").

[35] *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 2013 WL 6504801, at *12 (S.D.N.Y. Dec. 11, 2013) (noting that "courts . . . have required plaintiffs to plead heightened detail for holder claims" and collecting cases).

[36] *Chau v. Aviva Life & Annuity Co.*, 2011 WL 1990446, at *2 (N.D. Tex. May 20, 2011).

[37] Defendants, on the other hand, identify authority holding directly to the contrary.  (*See* Reply 6 (citing *Bruhl v. Price WaterhouseCoopers International*, 2007 WL 983263, at *7 (S.D. Fla. Mar. 27, 2007).)

[38] (*See, e.g.*, Opp. 28 ("Plaintiffs' amended complaints already allege their 'holder claim' theory in an 'intelligible and valid' manner under English law") (citing Lowe Decl. ¶¶49-130); Opp. 16 ("Mr. Lowe examined these allegations and concluded that they sufficiently plead a 'holder claim' theory under English law.") (citing Lowe Decl. ¶¶59-64).)

sold[] and when the sale[s] would have taken place.'" (Mot. 4, 15 (quoting *Pafumi v. Davidson*, 2007 WL 1729969, at *3 (S.D. Fla. June 14, 2007) (applying Florida substantive law).) Here, say Defendants, Plaintiffs failed to plead how many shares they would have sold, and their holder claims should fail as a result.

As an initial matter, the Court struggles to understand how requiring holder plaintiffs to allege the number of shares they would have sold furthers the purpose of Rule 9(b). As this Court previously observed, Rule 9(b) "protects defendants from unfounded allegations of wrongdoing which might injur[e] their reputations," and ensures that defendants are "fully inform[ed] . . . of their alleged roles in the fraudulent scheme so that they may prepare their defense."[39] But the number of shares that a plaintiff retained speaks not to the defendant's "wrongdoing" (*i.e.*, liability), nor, therefore, would such information be necessary to allow the defendants to "prepare their defense."[40] Rather it speaks only to the extent of the plaintiff's alleged damages—a subject that need not be pled with particularity.[41]

Moreover, the context of Defendants' quoted language suggests that *Pafumi's* approach may be more nuanced than Defendants suggest. The full sentence reads: "Where a plaintiff claims she was fraudulently induced to hold shares of stock, the plaintiff must allege specific reliance on the defendants' representations: *for example*, that if the plaintiff had read a truthful account of the corporation's financial status, the plaintiff would have sold the stock, how many

---

[39] *Alameda*, 2013 WL 6383968 at *41.

[40] The reliance element of an English common law deceit claim requires only that a plaintiff "rely on [the misrepresentation] and suffer[] loss." *Alameda*, 2013 WL 6383968 at *36. A defendant would be liable regardless of whether the loss stemmed from the retention of one share or one million shares.

[41] *See Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 2013 WL 6190253, at *3 (S.D. Tex. Nov. 26, 2013). Plaintiffs will have to provide evidence of the extent of their damages eventually, and doing so will likely prove challenging. But, for better or worse, this potential shortcoming is not one that provides the Court with a basis for dismissing Plaintiffs' case on the pleadings.

shares the plaintiff would have sold, and when the sale would have taken place."[42]   Read in context, Defendants' quoted language suggests that pleading the quantity and timing of the would-be sale are merely two "example[s]" of allegations that tend to show specific reliance. Indeed, *Pafumi* was quoting *Rogers v. Cisco Systems* and *Small v. Fritz Co.*, both of which clarified that the "particularity" inquiry is much broader: courts must determine whether "[t]he plaintiff [has] allege[d] actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied upon the misrepresentations."[43] Doing so "reinforces the reliance requirement by separating plaintiffs who actually and justifiably relied upon the misrepresentations from the general investing public, who, though they did not so rely, suffered the loss due to the decline in share value."[44]   In the context of holder claims, applying Rule 9(b) any less stringently would expose defendants to the types of "unfounded allegations" and "baseless claims" that Rule 9(b) is intended to screen.[45]

---

[42] *Pafumi*, 2007 WL 1729969 at *3 (applying Florida law) (emphasis added).  *See also In re Bank of Am.*, 2013 WL 6504801, at *13 (S.D.N.Y. Dec. 11, 2013) (applying Florida law and citing *Pafumi*); *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 184, 65 P.3d 1255, 1265 (2003) (applying California law under a pleading standard comparable to Rule 9(b)); *Anderson v. Aon Corp.*, 2011 WL 4565758, at *6 (N.D. Ill. Sept. 29, 2011) (applying California law and quoting *Small v. Fritz*), *aff'd*, 674 F.3d 895 (7th Cir. 2012).

[43] *Small*, 30 Cal. 4th 167, 184 (2003); *Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1314 (N.D. Fla. 2003).  *See also In re Bank of Am.*, 2013 WL 6504801 at *12 (citing *Rogers*); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 819 n. 45 (S.D. Tex. 2007).

[44] *Rogers*, 268 F. Supp. 2d at 1314; *Enron*, 490 F. Supp. 2d at 820 ("Nor have they pointed to actions suggesting their actual, direct reliance on Merrill Lynch that would distinguish them from any other Enron investors who did not rely on Merrill Lynch's analyst reports disseminated to the public.")

[45] *See Alameda*, 2013 WL 6383968, at *41 (S.D. Tex. Dec. 5, 2013). As Defendants correctly argue, when purchasers bring a securities fraud claim, the purchase itself is an action that separates the plaintiffs from the general investing public.  Holder claims, on the other hand, provide no such objective guidepost.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734-35 (1975); *United States v. O'Hagan*, 521 U.S. 642, 664 (1997) (recognizing "abuse

The Court finds this broader approach persuasive.[46]  Plaintiffs must allege that they reviewed specific statements; that they evaluated whether to hold or sell their shares; and, most important, they must allege facts—which must include more than mere references to Plaintiffs' "unrecorded thoughts and decisions"—showing that the statements motivated them to hold their shares rather than sell them.  Plaintiffs must further allege these facts with sufficient specificity to allow Defendants to prepare their defense.[47]

### (2)  Plaintiffs' Allegations of Reliance

Plaintiffs first argue that, through common allegations, *all* Plaintiffs have sufficiently pled reliance.  For example, Plaintiffs allege that they and their investment managers "employed their regular practices of reviewing . . . public information, their research, [and] BP's reported outlooks," among other information, "to determine whether . . . securities should be sold." (Alameda SAC ¶¶ 584–86, South Yorkshire SAC ¶¶ 613–15, Mondrian SAC ¶¶ 558–60; HESTA SAC ¶¶ 563–65; Stichting SAC ¶¶ 561–63; Nova Scotia SAC ¶¶ 55–559; Merseyside FAC ¶¶ 571–73; Bank of America FAC ¶¶ 564–66; IBM FAC ¶¶ 596–99; NYC FAC ¶¶ 605–07; USS FAC ¶¶ 572–74; *see also* Arkansas FAC ¶¶ 435–54; Virginia FAC ¶¶ 451–477; Washington FAC ¶¶ 396–99, 405–07, 433–34.)[48]  But these are the types of "broad allegations

---

potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others").

[46] Plaintiffs repeatedly note that this line of cases involves holder claims under Florida and California state law—not English law—and are therefore inapposite here.  This argument is entirely unpersuasive.  The cases focus not on the substance of Florida law, but rather on Rule 9(b)'s application to it.  The application of Rule 9(b) is precisely the issue with which this Court must contend.

[47] *See Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir. 2003) ("Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out.")

[48] To the extent that the Arkansas and Virginia Plaintiffs' Opposition constitutes a motion for leave to amend, (*see* Dkt. 1534 at 3-6), the Court denies it.

that . . . courts have rejected as insufficient to support holder claims."[49]  They contain, for example, "no details as to when plaintiffs would have sold their shares, . . . [or] any 'actions, as distinguished from unspoken and unrecorded thoughts and decisions' that reflected an intent to sell their shares."[50]  Plaintiffs' holder claims are dismissed to the extent that they rely upon these overly general allegations of reliance.

Although these general allegations are plainly inadequate, many Plaintiffs plead additional allegations purportedly describing their unique reliance on BP's alleged misrepresentations.  For example, the plaintiffs who delegated investment authority to ███ ████████ allege:

> ████ tracked and relied upon BP's public statements regarding flow rate.  For instance, an internal ████ note dated April 30, 2010 referenced a flow rate of 1,000 barrels per day on April 27, 2010, and a revision upward from 1,000 to 5,000 barrels per day on April 29, 2010. . . . On each of these dates, in reliance on BP's publicly-stated flow rate estimates, ████ maintained the majority of ███'s BP position that it managed, rather than reduce or eliminate it.

(South Yorkshire SAC ¶591; IBM FAC ¶583.)  But, these allegations, too, fail to meet the requirements of Rule 9(b).  "Rule 9(b) requires Plaintiffs to specify 'with particularity' what actions it . . . forewent in reliance upon Defendants' alleged misrepresentations."[51]  Here, as Defendants correctly argue, Plaintiffs' factual allegations merely show that ████ *reviewed* Defendants' alleged misrepresentations, not that ████ relied upon them in making a decision. Instead, Plaintiffs depend entirely on one conclusory allegation of "unspoken and unrecorded thoughts and decisions" to show that BP's flow rate estimates factored into ████'s decision to forego selling BP's stock.  (*See* South Yorkshire SAC ¶591 ("On each of these dates, in reliance

---

[49] *Bank of Am.*, 2013 WL 6504801, at *13.

[50] *Id.*

[51] *Alameda*, 2013 WL 6383968, at *41.

17

on BP's publicly-stated flow rate estimates, ███████ maintained the majority of ██████ s BP position that it managed, rather than reduce or eliminate it"); IBM FAC ¶ 583 (same).)   Such allegations are insufficient to plead reliance in the context of a holder claim, and most of Plaintiffs' reliance allegations are similarly deficient.  (*See* South Yorkshire SAC ¶ 555; South Yorkshire ¶ 565 and Merseyside FAC ¶ 566; HESTA SAC ¶¶ 498, 551 and IBM FAC ¶¶ 500, 575; Stichting SAC ¶¶ 546–47; NYC FAC ¶ 571(c);[52] NYC FAC ¶¶ 584(f); USS FAC ¶¶ 563, 565(d), and 566; Merseyside FAC ¶ 558(a); IBM FAC ¶¶ 552–54.)   The Court dismisses them accordingly.

Some Plaintiffs, however, have adequately alleged reliance.  For example, the strongest allegations of reliance are made by the Alameda, Mondrian, Nova Scotia, NYC, and BOA Plaintiffs through the actions of their investment advisor, ████████████████████ ██████.[53]

> [O]n or about June 11, 2010, ████████████████████ sent a written update to certain of its clients apprising them of the publicly-known facts regarding the Deepwater Horizon rig explosion and oil spill, including the statement, "BP initially estimated the leakage at 5,000 barrels/day, however independent observers now believe the rate to be 12,000 to 19,000 barrels/day." ████████████████████ *stated its belief that BP could handle costs related to the spill, based on a publicly stated estimate of 450,000 barrels having leaked into the Gulf of Mexico by that point in time*. ██████ noted that BP's market capitalization had fallen by $80 million since the well explosion. In light of all these facts, and associated short-term costs and long-term considerations, ████████████████████ *stated its belief that*

---

[52] The NYC Plaintiffs also fail to allege reliance in ¶¶ 571(a), 571(b), and 584(a)-(e), but for a slightly different reason.  Although these allegations reference the NYC Plaintiffs' decision to retain BP Stock, they fail to identify any misrepresentation on which the decision purportedly relied.  Six of the USS Plaintiffs' allegations also suffer from this flaw, (USS FAC ¶ 565(e)-(j),) as do eight of the Merseyside Plaintiffs' allegations. (Merseyside FAC ¶¶ 548 and 558(c)-(i).)

[53] Each of these Plaintiffs (the "███ Plaintiffs") alleges reliance vicariously through their investment advisor, to whom they had delegated "full decisional authority."  (*See, e.g.,* Alameda ¶ 545.)

*the reduced value of BP stock "is more than discounted by the significant decline*
*in the share price and we continue to hold the shares."*

(Alameda SAC ¶¶ 551–52; Mondrian SAC ¶¶ 551–52; Nova Scotia FAC ¶¶ 551–52; New York City FAC ¶¶ 553–54; Bank of America FAC ¶¶ 552–53.)

These allegations are sufficient to allege reliance with respect to ███'s decision to forego selling Ordinary Shares on June 11, 2010. Not only do the ███ Plaintiffs allege that ███ reviewed specific misrepresentations, they explain how those alleged misrepresentations contributed to ███'s decision to refrain from selling their shares, and they rely on more than "unspoken and unrecorded thoughts and decisions" to do so. The USS and Merseyside Plaintiffs have similarly provided sufficient allegations of reliance. (USS FAC ¶ 565(a), (b), and (c); Merseyside FAC ¶ 558(b).)

## B. Post-Spill Damages

Defendants contend that Plaintiffs have not—and cannot, as a matter of logic—plead any recoverable damages based on their holding of shares in reliance on the challenged post-explosion statements. (Mot. 20.) As Defendants understand it, Plaintiffs' theory of the case is that: Defendants misrepresented their flow rate estimates; the overly optimistic portrayal of the flow rate estimates caused BP's stock to trade at an artificially inflated price; Plaintiffs refrained from selling the stock at this artificially inflated price in reliance on BP's misrepresentations; and Plaintiffs suffered damages as the artificial inflation in the stock price dissipated.

Defendants argue, compellingly, that holders cannot recover damages for declines in stock price attributable to the dissipation of artificial inflation. (Mot. 21 (citing *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 351 (5th Cir. 1987).) The price was inflated only because BP misrepresented its flow rate estimates. In other words, had BP never made the alleged misrepresentation, the stock price never would have been inflated, and Plaintiffs never would

have had an opportunity to sell the stock at an artificially inflated price.  Thus, on the one hand, Plaintiffs claim that BP's misrepresentation caused them injury; yet, on the other hand, without the misrepresentation, the Plaintiffs could not have realized the artificially high profit that they claim to have unjustly lost.

Plaintiffs respond that Defendants have mistakenly construed their damages theory too narrowly.  Plaintiffs seek damages for the *total* decline in stock price that followed the decision to retain their Ordinary Shares.  (*See, e.g.*, Alameda ¶ 541(d).)  Although a *portion* of that total decline is attributable to the dissipation of post-spill artificial inflation, other factors contributed as well.  For example, Plaintiffs argue that the value of Ordinary Shares declined following negative disclosures that were corrective of Defendants' pre-spill misrepresentations; that the shares declined in part due to the market's general loss of trust in BP; and that some declines were attributable to negative information that was unrelated to *any* fraud (*e.g.*, general market movement in the industry).[54]

The Court concludes that Plaintiffs have alleged cognizable damages.  Plaintiffs allege that they were induced to continue holding their Ordinary Shares, and that they were therefore

---

[54] Plaintiffs bear much of the blame for Defendants' misunderstanding.  Plaintiffs poorly articulated their position both in the briefing and at oral argument.  But the Court must hold that they articulated it nonetheless.  (*See* Opp. 30 (noting that some corrective disclosures (and resulting declines) were related to pre-explosion fraud); Opp. 32 n.14 (distinguishing Defendants' precedent on the grounds that "other corrective disclosures/events beyond those related solely to flow rate drove its stock movement."); Hr'g Trans. 64:20-66:4 (same), 72:11-74:3 ("Because we allege 20 corrective events.  Some of them are related to flow rate, some of them are not.  Some of them are corrective of the pre-spill fraud that is still live. . . . [W]e're entitled to the correctives of the pre-spill fraud.  We're entitled to the general market declines.") Moreover, Plaintiffs' Complaints contemplate this broader theory of damages.  (*See* Alameda ¶ 541(d) (alleging damages for the total decline in stock price following decision to retain shares, not just the declines associated with artificial inflation.)

The Court notes that it reached this conclusion without considering—and prior even to receiving—Plaintiffs' improper June 1st supplement.  (*See* Dkt. 1563 (Plaintiffs' Supplement); Dkt. 1567 (Defendants Response to Plaintiffs' Supplement).)

exposed to *all* subsequent declines in price—not just those stemming from revelations of the true flow rate. (*See* Alameda ¶ 540, 541(d).) Defendants' motion to dismiss addresses only a portion of those declines, and therefore fails to provide the Court with a basis for dismissing Plaintiffs' post-spill holder claims as a matter of law.

## IV.    <u>NEWLY ALLEGED MISSTATEMENTS</u>

Each Plaintiff has amended its complaint to bring claims under English law based on seven additional public statements made by BP and its representatives. Plaintiffs bring each of these claims under English law for common law negligent misrepresentation (known as "negligent misstatement") and common law fraud (known as "deceit" in English parlance).[55] A subset of Plaintiffs also asserts claims for securities fraud under Section 10(b) of the Securities Exchange Act.[56] Additionally at issue are newly added claims based on statements that BP representatives made via direct, private communications to Plaintiff USS (thirteen alleged misstatements) and to Plaintiff IBM (one alleged misstatement).

The elements of common law negligent misstatement are: (1) Defendant owed Plaintiff a duty to speak carefully; (2) which Defendant breached by failing to exercise due care before speaking; (3) Plaintiff relied on Defendant's careless misstatement; and (4) Plaintiff suffered a loss.[57] The elements of common law deceit are: (1) Defendant makes a false representation; (2)

---

[55] Plaintiffs also allege claims under an English statute called the Financial Services and Markets Act of 2000 (the "FSMA"), but these claims were not addressed in Defendants' Motion to Dismiss.

[56] The differences in analysis between Exchange Act claims and English law claims are narrow. The primary difference is that the PSLRA imposes a heightened pleading standard on securities claims brought under federal law. Thus, to the extent that Plaintiffs have inadequately pled a claim brought under English law, the claim similarly fails—and is dismissed here—to the extent that a Plaintiff also brings it under the Exchange Act.

[57] *Alameda*, 2013 WL 6383968 at *36.

knowing it to be untrue, or being reckless as to whether it is true; (3) and intends that Plaintiff should act in reliance on it; and (4) Plaintiff does rely on it and suffers loss."[58]

**(A)      Deceit Claims: Alleged Public Misstatements**

At issue are seven statements (Statements A-G) that BP made publicly between March 6, 2007 and October 23, 2009.   Defendants move to dismiss five of the misstatements for failure to allege that the statements were false when made.   According to Defendants, many of the statements were non-actionable statements of opinion or expressions of future intention.   As this Court has previously noted, statements of future intention, opinion, and belief are actionable under English law only if Plaintiffs plead facts showing that "the [speaker's stated] intention was not genuinely held or [that his] opinion or belief was not genuinely entertained."[59]

Defendants argue that other statements are merely generalized positive remarks—not representations of fact—and, therefore, are not actionable under English law.   Defendants correctly state the law,[60] but the difficulty lies in etching the fine line between generalized optimism and factual misdirection.[61]   Fortunately, the Court's previous holdings on the subject serve as a ready-made stencil.   "General statements about corporate 'progress' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision."[62]   For example, "statements about BP's 'commitment to safety,' prioritization of 'process safety performance,' headway in making 'real progress' in the process safety arena, and desire to become a 'world leader in process safety'" are

---

[58] *Id*.

[59] *Id*. at *37 n. 20.

[60] *See Alameda*, 2013 WL 6383968 at *37 (holding that, as under Section 10(b), such statements are not actionable under English law).

[61] *Id.* at *21.

[62] *BP I*, 843 F. Supp. 2d at 757 (internal quotations omitted).

"simply too illusory a metric."[63]   On the other hand, "Where Plaintiffs have tethered their allegations to BP's statements involving progress in process safety efforts as measured against the Baker Report recommendations," there is a "clear roadmap for improvement" against which progress can be measured.[64]

Defendants additionally move to dismiss four of the alleged misstatements on the grounds that Plaintiffs have failed to allege scienter.  "English common law deceit has a scienter requirement largely identical to [plaintiffs'] section 10(b) claims," but analysis of 10(b) claims and common law deceit claims differ in one important way: unlike their Exchange Act claims, Plaintiffs' deceit claims are not subject to the heightened pleading requirements of the PSLRA.[65] To state a claim, Plaintiffs need not allege facts giving rise to a "strong" inference of scienter. Instead, the Court must "determine whether the [factual allegations] support a *plausible* inference of scienter, as required by Rule 8(a) and *Iqbal*."[66]

### (1)    Statement A: 2006 Annual Review (March 6, 2007)

Plaintiffs allege that BP representatives made several misstatements in the 2006 Annual Review.  Peter Sutherland, the Chairman of BP's Board, made the first two statements at issue; CEO John Browne made the third; and the fourth and fifth statements are unattributed to any speaker.

### (a)    Statements by Chairman Peter Sutherland

The 2006 Annual Review included a "Chairman's Letter," signed by Peter Sutherland, and Plaintiffs allege that the Letter contained several misrepresentations.  Defendants move to

---

[63] *Id.*

[64] *Id.* at 757, 759.

[65] *Alameda*, 2013 WL 6383968, at *37.

[66] *Alameda*, 2013 WL 6383968, at *37.

dismiss on the grounds that Sutherland's statements reflect his opinions or future intent, and Plaintiffs have failed to allege facts showing that the opinions or future intentions were not honestly held.  The Court agrees.  Most of the statements contemplate future performance (*e.g.*, "we . . . will implement," "[the board] will keep you fully advised on the implementation") or Sutherland's opinion (*e.g.*, "we continue to be justly proud of our safety record").  Yet Sutherland is rarely mentioned in the Complaint, and at no point do Plaintiffs allege facts showing that he knew BP was not planning to follow any of the Baker Panel's recommendations. Indeed, they fail to attribute much knowledge to Sutherland at all.

(b)      Statements by CEO John Browne

The 2006 Annual review also included a "Group chief executive's review," signed by CEO John Browne, that contained a number of alleged misstatements.  Defendants argue that the statements are expressions of future intentions and expectations.  (Mot. 26.)  Plaintiffs respond that, at worst, the representations are mixed statements of then-present fact blended with statements of future intent.  For example, say Plaintiffs, the statements reference what BP was "already doing" to "embed . . . high standards of safety . . . throughout BP."  (Opp. 36.)

The Court agrees with Defendants**.**  Most of the statements are of future intention (*e.g.*, BP "will implement"), which are actionable only if the speaker did not genuinely possess that intention.  Plaintiffs plead no such allegations here.  To the extent that the excerpts contain statements regarding the then-present state of BP (*e.g.*, as to what BP was "already doing" to improve safety), they are the type of generalized statements regarding a post-Texas City commitment to safety that the Court has previously rejected.[67]

---

[67] *Compare* (Alameda SAC ¶ 354(b) ("we were already" implementing "an ambitious four-year programme of investment in safety and operational integrity right across the group") *with In re BP p.l.c. Sec. Litig.*, 109 F. Supp. 3d 946, 966-67 (S.D. Tex. 2014) (dismissing alleged 2006

These statements are not actionable for the reasons discussed above.  They consist of statements of future intention (*e.g.*, "we will be developing," "we will apply," "we have committed to implement").  To the extent that the statements pertain to statements of fact (*e.g.*, "we continued [in 2006] to make significant investment"), the statements pertain to pre-Baker Report conduct.[68]

**(2)     Statement B: 2007 BP Magazine, Issue 1, 2007 (April 7, 2007)**

Plaintiffs allege that Defendant Malone, President of BP America, made a number of misrepresentations in Issue 1 of BP Magazine in 2007. Several of the statements are quintessential statements of future intent (*e.g.*, "we will implement"), and Plaintiffs have not adequately alleged that Malone did not genuinely hold that intention at the time of the statement. Although one of the statements pertains to a then-present fact and specifically references the Baker Panel recommendations (*e.g.*, "many of the [recommendations] . . . have either been taken or are currently underway")—typically the hallmarks of an actionable statement—the context of the statement shows that it was made in reference only to the Texas City refinery and BP's refineries generally.  As the Court has previously held, "Nothing in the Complaint impugns the

---

misstatements that BP had been "implementing a new integrity management standard" and "applying ... knowledge [learned from Texas City] widely across BP's operations.")

[68] *See BP I*, 843 F. Supp. 2d at 759 ("Where Plaintiffs have tethered their allegations to BP's statements involving progress in process safety efforts as measured against the Baker Report recommendations," there is a "clear roadmap for improvement" against which progress can be measured.);  *see also In re BP p.l.c. Sec. Litig.*, 109 F. Supp. 3d 946, 966-67 (S.D. Tex. 2014) (dismissing alleged 2006 misstatements that BP had been "implementing a new integrity management standard" and "applying ... knowledge [learned from Texas City] widely across BP's operations.")

accuracy of this statement[] or indicates how an alleged falsehood regarding BP's refineries relates to the fall-out from a later disaster in BP's offshore drilling operations."[69]

One of Malone's statements, however, bears closer scrutiny: "This year, we'll complete a large fibre optic system in the Gulf to connect all of our deepwater fields to shore with a high-fidelity data network. This network will significantly improve safety and operations efficiency." Plaintiffs note that this statement aligns with Baker Panel Recommendation #2, which recommends the adoption of an integrated and comprehensive process safety management system.

Defendants argue that this is a statement of future intent ("we[ will] complete").  But the word "complete" implies that BP had already begun the process of connecting "all of [its] deepwater fields" to the fiber optic system.[70]  The Court has held that a similar statement, which contemplated "contin[uing] to implement" the Baker Panel recommendations, was actionable.[71] The Court denies Defendants Motion to Dismiss with respect to this particular statement.

### (3)    Statement D: Conn's Strategy Presentation Call (Feb. 27, 2008)

Plaintiffs allege that Ian Conn made numerous misrepresentations on a February 27, 2008 conference call with investors.  Defendants argue that these statements are not actionable for two reasons.  First, the context shows that Conn's remarks were part of his discussion of BP's "Refining and Marketing" segment, and thus had no connection to BP's implementation of

---

[69] *Alameda*, 2013 WL 6383968, at *23.

[70] (*See* Reply at 20 (noting the Court's previous holding that the phrase "continue[s] to implement" implies that the company had already implemented the Baker Panel recommendations in some respects and thus was not a statement of future intent).)

[71] *BP I*, 843 F. Supp. 2d at 757 (holding the following statement actionable: "We *continue* to implement the roadmap provided to ourselves and the industry by the ... Baker Panel.") (emphasis added).

OMS.  Second, Conn's statements are the type of generalized statements that this Court has previously held non-actionable.

The Court agrees on both points.  Almost all of the relevant statements are the type of "generalized statements" regarding BP's "commitment to safety [and] prioritization of process safety performance" that the Court has previously rejected.[72]  And the one sentence that is sufficiently "tethered . . . to BP's statements involving progress . . . as measured against the Baker Report recommendations"  begins with the phrase "I believe," suggesting that it was a statement of opinion.  Plaintiffs have pled no facts suggesting that Conn did not genuinely believe the truth of his statement.

### (4) Statement C (*BP Magazine*, Issue 4 2007); Statement E (*BP Magazine*, Issue 1 2008); Statement F (*BP Magazine*, Issue 4 2008); Statement G (*BP Magazine*, Issue 3 2009)

Plaintiffs allege that a number of misstatements were made in four issues of *BP Magazine*.  Defendants argue that none of the alleged misstatements is actionable because Plaintiffs failed to attribute any of the statements to any individual.  Instead, say Defendants, the Complaint merely alleges that the relevant articles could not have been written "without the direct involvement, oversight, and approval [of] the highest levels of BP, including the Individual Defendants."[73]  Citing precedent, Defendants argue that this amounts to impermissible "group pleading" and is inadequate to allege scienter under Rule 9(b).

---

[72] *Cf.*, *e.g.*, *BPI*, 843 F. Supp. 2d 755, 757 (S.D. Tex. 2012) (dismissing claims based on overly general statement that "[s]afety, both personal and process, remains our highest priority . . . . During the year [2008] we began migrating to the new BP OMS, which has an increased focus on process safety....")

[73] The Complaint alleges that "Defendant Hayward signed the certification statement for the foregoing statement," but Defendants have attached the magazine as an exhibit and stated that the issue did not contain any certification statement.  Plaintiffs did not respond to this argument in their brief.

Plaintiffs respond that Defendants' precedent is inapplicable because it was applying the PSLRA's heightened pleading standard to federal securities claims. Here, Plaintiffs' bring most of their claims under English law, and the PSLRA—which applies only to securities claims that are brought under federal law—is inapplicable. Moreover, say Plaintiffs, not only is the PSLRA's heightened pleading standard inapplicable, English law entitles them to a "rebuttable presumption [that Defendants acted with] an intention to deceive." (Opp. at 44 (quoting Lowe Dec. ¶ 70).) Plaintiffs' expert, Mr. Lowe, opines that "intention is not a matter in which a [c]ourt will summarily dismiss a claim without a trial." (Opp. at 44 (quoting Lowe Dec. ¶ 70).) Plaintiffs additionally argue that, even if Defendants' precedent applies, the Complaints state a claim against BP under the "corporate scienter" doctrine.

The Court concludes that Plaintiffs have failed to adequately allege scienter, and that claims based on these alleged misstatements should be dismissed. "Although the PSLRA's stricter scienter requirement does not apply to state-law fraud claims, Rule 9(b) nevertheless incorporates an element of scienter."[74] In other words, while Plaintiffs' English law claims are not subject to the "strong inference" standard of the PSLRA, they still need to meet the heightened pleading standard of Rule 9(b) by alleging scienter with particularity. Defendants have cited several cases holding that "group pleading" fails to satisfy Rule 9(b)'s requirement that the "who" of the fraud be specified. (*See* Reply at 21 (citing cases).) Plaintiffs have not

---

[74] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008); *see also Flaherty & Crumine Preferred Income Fund, Inc.* v. *TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) (although "common law fraud claims are not subject to the heightened 'strong inference' of scienter standard imposed by the PSLRA," those claims "are still subject to the heightened pleading standard of Rule 9(b)."); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) ("Significantly, this court has never adopted the "group pleading" doctrine, even before the PSLRA. . . . Even prior to the PSLRA, section 10(b) and Rule 10b–5 required plaintiffs to identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements.").

cited any precedent to the contrary, nor have they cited any precedent suggesting that a presumption under English law can serve to trump the pleading requirements of Rule 9(b). Their conclusory allegations that the individual Defendants, by virtue of their positions, must have been involved in the statement are inadequate to meet the Rule 9(b) standard.[75]

Plaintiffs' reliance on the corporate scienter doctrine is similarly unavailing. To plead scienter as to a corporate defendant, a plaintiff generally needs to "link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement."[76] As discussed above, Plaintiffs failed to link the statements to any individual. The Court has previously acknowledged two exceptions to this general rule, however, and Plaintiffs rely on those exceptions here: (1) unattributed corporate documents may be attributed to the corporation "where the statements were 'made by its authorized officers to further the interests of the corporation'";[77] and (2) corporate scienter may be adequately pled without naming the individuals who concocted the fraud if the statement was "so egregious as to rise to the level of extraordinary and dramatic falsity."[78]

The first exception is inapplicable here. When the Court previously applied it, the Plaintiffs had specifically identified the "authorized officers" who made the statement—and even then, the Court held that it was "unclear whether [the] individuals would have qualified as 'authorized officers' for purposes of corporate scienter analysis."[79] Here, Plaintiffs generally

---

[75] *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

[76] *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 631 (S.D. Tex. 2013)

[77] *BP I*, 843 F. Supp. 2d at 791 (citing *Southland*, 365 F.3d at 361).

[78] *Id.* (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008)).

[79] *Id.*

allege only that authorized officers were probably involved in overseeing the publication or supplying information to its writers. This allegation is insufficient.

Plaintiffs' reliance on the second exception also falls short. Courts have "underscored that [the exception] is narrow indeed."[80] To illustrate egregious falsity, the Seventh Circuit described a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when in fact it had sold zero.[81] Here, BP allegedly stated that it was employing OMS on all rigs that it operated, but in fact it was employing OMS only on rigs that it owned. If BP wasn't employing OMS on *any* rigs, the "egregious falsity" exception might apply. But the allegations here fall well short of that mark. The Court has rejected this argument in the context of similar misstatements.[82]

### B. Deceit Claims: Statements Made Directly to █████ or █████

Plaintiff █████ alleges that BP made thirteen additional misrepresentations directly to █████ in emails or in statements made during private meetings. Plaintiff █████ alleges that BP made one such misrepresentation during an investor meeting. Defendants move to dismiss twelve of these alleged misstatements on the grounds that Plaintiffs have failed to allege scienter and, with respect to nine of the misstatements, that Plaintiffs have failed to allege falsity.[83] The Court need not address the alleged falsity of the misstatements, however, because it holds that Plaintiffs have failed to adequately allege scienter.

---

[80] *Id.* at 789.

[81] *Makor*, 513 F.3d at 710.

[82] *See In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d at 630.

[83] Two of the alleged misstatements—Statements T and U—have already been sustained by this Court in the *Alameda* action, so Defendants do not challenge them in the context of Plaintiffs' claim for common law deceit. (Mot. at 33 n.34.) Defendants do, however, move to dismiss Plaintiffs' negligent misstatement claims based on these alleged misstatements.

### (1)    Statements H, I, K, L, M, and N

███ alleges claims based on misstatements contained in six emails.  Four of the emails were allegedly sent by BP's Manager of Extra Financials and Investor Relations, Giles Mackey. Plaintiffs fail to allege who sent the other two emails.  Defendants argue that the claims based on these alleged misstatements should be dismissed because Plaintiffs fail to allege scienter with respect to Mackey, and they fail to allege scienter for—or even name the sender of—the two unattributed emails.  The Court agrees.  Plaintiffs fail to allege anything regarding Mackey's state of mind, and the unattributed statements are insufficient for the reasons discussed in Section IV.B.4, *supra*.

### (2)    Statements J, O, P, Q, R, and S

███ additionally alleges that Sutherland, William Castell, and several non-Defendants made misstatements at investor meetings.  ███ also alleges that Defendants Suttles and Conn were present at a meeting where a misrepresentation was made by an unspecified individual. Defendants again argue that Plaintiffs have failed to adequately allege scienter with respect to these alleged misstatements, and the Court agrees.

Nowhere in its complaint does ███ allege anything regarding Sutherland's knowledge. They argue only that Sutherland's recklessness in making the statement is "self-evident" based on his position as Chairman of the Board. (Opp. 50.)  But courts routinely reject this type of scienter allegation.  A "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."[84]

Plaintiffs' allegations as to Suttles are also inadequate.  Plaintiffs seem to rely on the Court's previous holding that Suttles acted with scienter when he made post-spill statements

---

[84] *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

regarding flow rate. (*See* Opp. at 50.) This is an inadequate basis for ascribing scienter to pre-spill statements regarding OMS.[85]

Plaintiffs allege that Castell knew his statements were false because he was a member of SEEAC, which received reports from GORC and quarterly copies of the "Orange Book." These allegations of scienter are stronger, but still insufficient. As Defendants correctly argue, (Reply at 27), the Court has already held that this type of allegation regarding Castell's membership on SEEAC "is nothing more than a reformulation of the traditional, boilerplate allegation that a corporation's executives *as a group* knew or should have known that corporate statements were inaccurate." Group pleading is impermissible under Rule 9(b).[86]

### C. Negligent Misstatement Claims

Defendants move to dismiss all negligent misstatement claims that are based on the newly-alleged misstatements for reasons that the Court has already articulated in prior rulings. Indeed, the Court has already held that negligent misstatement claims based on public statements fail as a matter of law,[87] and that actions filed in Texas after May 24, 2012—which includes the ███ and ███ actions—are time barred.[88] Plaintiffs provide the Court with no reason to revisit those holdings. (*See* Opp. 50 (incorporating by reference Plaintiffs' prior briefing on these issues).) Their newly-alleged negligent misstatement claims are dismissed accordingly.

## V. NY/MASSPRIM CLAIMS BASED ON 2009 SUSTAINABILITY REPORT

Defendants move to dismiss the NY/MassPRIM Plaintiffs' claims that are based on alleged misstatements in the 2009 Sustainability Report. Defendants contend that these

---

[85] *BP I*, 2013 WL 6383968, at *25.

[86] *See* Section IV.B.4, *supra*.

[87] *BP I*, 2013 WL 6383968, at *46.

[88] *In re BP p.l.c. Sec. Litig.*, 51 F. Supp. 3d 693, 697-700 (S.D. Tex. 2014).

statements are unattributed to any individual, and, as the Court has twice held previously, Plaintiffs have therefore failed to allege scienter with respect to the Report. Plaintiffs respond that they have bolstered their amended complaint with allegations specifically tying Defendant Hayward to this particular report, and that dismissal—although previously "understandabl[e]"—is no longer appropriate.

"[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue."[89] Examples of a specific factual link "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement."[90]

Here, the NY/MassPRIM Plaintiffs allege that "BP [had] assigned ultimate sign-off to Defendant Hayward for BP's sustainability reports" from 2007 to 2010. (Dkt. 1207, ¶ 332(i).) But, at best, this allegation merely links Hayward to an obligation to "sign off" on sustainability reports in general, not the 2009 report specifically. The Court rejected a similar argument in a previous ruling, holding that "the committee's mandate to review for accuracy and commend for publication" documents related to safety "does not adequately allege that [the committee] actually reviewed *this* [safety-related] document."[91] Indeed, in illustrating examples of specific factual links, *Southland* makes reference to a "signature on *the* document," not general authority

---

[89] *Southland*, 365 F.3d at 365.

[90] *Id.*

[91] *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 631 (S.D. Tex. 2013). On the other hand, the Court held that the plaintiffs had adequately alleged scienter by alleging that "*this particular publication* [the 2009 Annual Review] was reviewed" at a meeting of the BP Board of Directors. *Id.*

to sign off on certain types of documents.  The Court dismisses the NY/MassPRIM Plaintiffs'

claims to the extent that they are based on unattributed statements contained in the 2009

Sustainability Report.

**V.      SECTION 20(a) CLAIMS AGAINST ANDREW INGLIS**

Defendants move to dismiss the remaining Exchange Act Claims against Defendant

Inglis, which consist only of claims brought under Section 20(a).  Defendants argue that this

Court has already dismissed Section 20(a) claims against Inglis, and that Plaintiffs have failed to

allege any facts that should change the analysis here.  (Reply 29-30 (citing *In re BP p.l.c. Sec.

Litig.*, 2014 WL 4923749, at *6 (S.D. Tex. Sept. 30, 2014); *BP Sec. Litig.*, 922 F. Supp. 2d at

639-40; *BP Sec. Litig.*, 843 F. Supp. 2d at 791-92).)  The Court agrees.  Plaintiffs' remaining

Section 20(a) claims against Inglis are dismissed.

**VI.     CONCLUSION**

After considering the parties' filings, the oral arguments of the parties, and the applicable

law, the Court holds that Defendants' Motion to Dismiss Plaintiffs' Amended Complaints is

**GRANTED in part and DENIED in part**; Defendant Rainey's Motion to Dismiss is

**GRANTED** for the reasons set forth at the motion hearing on May 8, 2017 (Hr'g Trans. 89:4-

98:11); and Plaintiffs' Motion to Strike the Declaration of Martin Moore is **DENIED** as moot.[92]

**IT IS SO ORDERED**.

Signed this 30th day of June 2017.

_____
Hon. Keith P. Ellison
United States District Judge

---

[92] The Court's holdings do not rely on Mr. Moore's declaration.